John N. HAYES, and James E. Larsen

v.

INTERNATIONAL ORGANIZATION OF MASTER, MATES & PILOTS.

Civ. No. HM87–1084.

United States District Court,
D. Maryland.

June 8, 1987.

Arthur L. Fox, Paul Alan Levy, Alan B. Morrison of Public Citizen Litigation Group, Washington, D.C., for plaintiffs.

Burton M. Epstein and Steinberg & Tugendrajch, New York City, W. Michel Pierson, Baltimore, Md., for defendant.

## MEMORANDUM

HERBERT F. MURRAY, District Judge.

The two plaintiffs in this action, John Hayes and James Larsen, are members of the International Organization of Masters, Mates & Pilots. [Hereinafter "MM & P" or the "Union"] In addition, plaintiff Hayes is a member of the Union's General Executive Board ["GEB"], having been elected as the Vice President—Atlantic Ports during one of the Union's regularly scheduled quadrennial elections in the autumn of 1984. They bring this action against the Union, alleging that the Union has violated their rights by suspending Hayes from his position as Vice President while it conducts a recall referendum. They allege that the Union has suspended Hayes as part of a purposeful scheme to suppress dissent in the Union, since Hayes has often been an outspoken critic of cur-

rent Union leadership. Plaintiffs also contend that the recall referendum is being conducted in an invalid manner.

Plaintiffs are currently before the court to seek the issuance of two preliminary injunctions. First, they seek an injunction ordering the defendants to reinstate plaintiff Hayes to his elected union office as Vice President pending the outcome of a recall referendum. Second, they seek an injunction ordering the defendant to impound all ballots in the ongoing referendum.

In addition, on May 28, 1987, plaintiffs sought and received a temporary restraining order, prohibiting the defendant from conducting further contract negotiations to supplant the Offshore contracts scheduled to expire on or about June 15, 1987, and to take no action to seek member ratification of new agreements. This TRO was entered by Judge Howard of this court, in his capacity as Chambers Judge, and was to expire on June 5, 1987. On June 5, 1987, in open court, this court extended the TRO for ten days, pending a decision on plaintiffs' motions for preliminary injunctions.

After hearing the argument of counsel at a hearing on June 5, 1987, and after fully considering the memoranda and exhibits filed by the parties, the court is now prepared to rule. For the reasons set forth below, the court will grant both of plaintiffs' motions for preliminary injunctions, but will vacate the TRO.

*Background*

The MM & P is governed by a General Executive Board. The GEB is made up of a President, Secretary–Treasurer, and eight Vice Presidents. The President and Secretary–Treasurer are elected by the general membership, while the eight Vice Presidents are elected by the assorted independent Divisions or Groups which make up the Union.

The largest Division is the Offshore Group, which represents the deck or bridge officers on deep-sea, oceangoing vessels. The Offshore Group elects three of the eight Vice Presidents: Vice President—Atlantic Ports, Vice President—Pacific Ports, and Vice President—Gulf Ports. In 1984, plaintiff Hayes was elected as the Vice President—Atlantic Ports, and he assumed office on January 1, 1985.

In his affidavit in support of plaintiffs' motion for preliminary injunction, Hayes describes the series of conflicts he has had with the other members of the GEB ever since he assumed office. While the parties hotly contest the characterizations of the events—Mr. Hayes views himself as the "outsider" coming into Union office and fighting corruption within, while the defendant portrays Hayes as a trouble-maker who refuses to abide by reasonable rules— they do not seem to disagree that the events occurred. The court will not repeat all the allegations made by Hayes in his affidavit, but will list the sequence of events which, according to plaintiffs, reveal the Union's attempt to suppress dissent.

When Mr. Hayes first took office, he also assumed a position as a trustee for the Union Pension and Welfare Funds.[1] In the course of learning about the management of the Union's funds, he concluded that the funds were being mismanaged, and he became very critical of the other trustees. His criticism did not please the other trustees, and in June 1985, he was removed as a trustee. After his removal, he conveyed his suspicions of fiduciary mismanagement to officials at the Department of Labor, and to a reporter for the Journal of Commerce, a publication widely read by MM & P members and others in the maritime industry. Following publication of an article in the Journal of Commerce concerning the Union Funds, Vice President David York wrote a letter to the other members of the GEB, claiming that Hayes was a threat to the Union, and demanding that they do something about him. (Exhibit B to Plaintiffs' Motion)

---

1. Hayes contends that he had a right to be a trustee because of his election to the office of Vice President—Atlantic Ports. The defendant, on the other hand, argues that Hayes had no such right, and was never properly a trustee. It is not disputed, however, that Hayes did attend some trustees' meetings.

In October, 1985, the GEB passed a rule requiring members of the GEB or other representatives of the Union to receive prior authorization before providing information on Union affairs to the press. (Exhibit C to Plaintiffs' Motion) Hayes claims that this "gag order" was specifically aimed at him, and that in spite of requesting permission several times to release information to the press, his requests were ignored by the GEB.

In late 1986, the GEB proposed a special dues assessment and conducted a referendum on the issue. Hayes did not agree that such an assessment was necessary, and in his attempts to oppose it, he had numerous conflicts with other GEB members. At one point during the dues referendum, Hayes sent a mailing to the members, and included a copy of a Journal of Commerce article describing the lawsuit brought by the Secretary of Labor against the current trustees of the MM & P Funds.

The following day, March 31, 1987, an angered GEB held a meeting in which by a two-thirds majority, they voted to remove Hayes from office, and to conduct a recall referendum. The vote was conducted pursuant to Article V, Section 12(a) of the MM & P Constitution.[2] On April 3, Hayes contacted Union headquarters and spoke to the MM & P Comptroller, Harry Seidman, asking for the opportunity to send out a mailing to the members concerning the recall vote either before or at the same time as the ballots were mailed. (Hayes Affidavit ¶ 36; see also Exhibit J to Plaintiffs' Motion) He was informed that certain mailing procedures were required. (Exhibit K to Plaintiffs' Motion) On April 8, the ballots were mailed to the membership, and on April 14, a letter to the members from former MM & P President Thomas O'Callaghan was mailed to the members, urging them to vote to recall Hayes from office. (Exhibit M to Plaintiffs' Motion) On April

20, Hayes' literature was mailed to the members.

*Standard for Preliminary Injunction*

The Fourth Circuit's standard for issuing preliminary injunctions under Rule 65(a) of the Federal Rules of Civil Procedure are set out in *North Carolina State Ports v. Dart Containerline Co.*, 592 F.2d 749 (4th Cir.1979) and *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189, 195–97 (4th Cir.1977). The Court of Appeals applies a balance-of-hardship test. The four factors considered under that test are:

(1) plaintiff's likelihood of success in the underlying dispute between the parties;

(2) whether plaintiff will suffer irreparable injury if interim relief is denied;

(3) the injury to defendant if an injunction is issued; and

(4) the public interest.

*North Carolina*, 592 F.2d at 750. In discussing the interrelationship of these factors, the court said:

> Of all the factors, the two most important are those of probable irreparable injury to the plaintiff if an injunction is not issued and likely harm to the defendant if an injunction is issued. If, upon weighing them, the balance is struck in favor of plaintiff, a preliminary injunction should issue if, at least, grave or serious questions are presented. *Id.*

## I.  REINSTATEMENT OF HAYES TO HIS POSITION AS VICE PRESIDENT

■ Plaintiffs argue that the removal of Hayes from his position as Vice President—Atlantic Ports, pending the results of a recall referendum, is unlawful for several reasons. First, they argue that the removal is unlawful because it was accomplished summarily, without notice or hearing, in violation of the MM & P Constitu-

---

**2.** Article V, Section 12(a) states:

International Officers—The General Executive Board shall have the power to suspend any International Officer from Office by the two-thirds majority vote of the entire Board. Immediately after any suspension, the General

Executive Board shall submit a recall referendum ballot to the appropriate membership of the Organization which shall contain a description of the offense(s) and the approximate dates thereof.

tion and the democratic principles embodied in Titles I and IV of the Labor–Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 *et seq.* ["LMRDA"].

Second, they argue that it deprived Hayes and the Offshore membership which he represents of their Title I right to speak, be heard and to participate in internal union deliberations through their elected representative.

Finally, plaintiffs argue that the removal violates the "whistle blower" protection in the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*, ["ERISA"], since, according to plaintiffs, the removal was in part a reprisal against Hayes for having reported various alleged fiduciary violations by union trustees.

Plaintiffs argue that they will suffer irreparable injury if an injunction is not granted because the members who are Mr. Hayes' constituents will be denied the services of their elected officer. In addition, plaintiffs claim that since Hayes' removal was part of a purposeful campaign to suppress member dissent, "a chilling pall of uncertainty will hang over the speech rights of all dissident MM & P members." (Plaintiffs' Reply Memorandum at page 9.) The court agrees that plaintiffs will suffer irreparable harm if an injunction is not granted. *See, e.g., Kupau v. Yamamoto,* 455 F.Supp. 1084, 1090 (D.Haw.1978), *aff'd,* 622 F.2d 449 (9th Cir.1980) (District court issues injunction ordering union to install elected official in office since each day that he is deprived of rights, privileges and prerogatives of office constitutes irreparable injury to him and his constituents.)

This injury is to be balanced against any harm to the defendant that an injunction would cause. In its legal memorandum, the defendant did not allege any specific harm that reinstatement of Mr. Hayes would cause. When asked by the court during the hearing to explain what harm might occur, defendant stated that the GEB followed the procedures set out in the Constitution in suspending Mr. Hayes from his office, and that it would irreparably harm the members if Mr. Hayes was "foisted back on the membership" after the GEB, a duly-elected body, had determined that he should be suspended.

The court does not find defendant's argument convincing. In essence, defendant argues that harm is caused to the Union whenever an injunction orders the Union to take an action different from that favored by the majority of the GEB. Clearly this argument goes too far.

The court agrees with defendant that there may be unusual situations where the officer's misconduct is so injurious to the union that the immediate removal of the official is called for in order to avoid irreparable harm to the union. However, the offenses with which Hayes is charged do not appear to the court to pose any immediate threat to the union. (*See* Exhibit L to Plaintiffs' Motion) The defendant was unable to point out to the court any other harm that would result from Hayes' reinstatement.

In light of the fact that the court finds that there will be irreparable harm to the plaintiffs if an injunction is denied, and that there is no harm to the defendant if the injunction is granted, the plaintiff need not demonstrate a likelihood of success on the underlying merits. It is sufficient that "grave or serious questions are presented." The court finds that such questions are raised in this lawsuit. There is strong support in the law for plaintiffs' position that an *elected* union official cannot be removed from office for his speech if the removal is part of an attempt to stifle dissent in the union. *See Bradford v. Textile Workers,* 563 F.2d 1138, 1142 (4th Cir.1977) (removal of an elected union official for exercise of free speech is "discipline" which is proscribed by § 609 of the Act).[3] *See also*

---

**3.** While the defendant suggests that the holding in *Bradford* is weakened by the Supreme Court's decision in *Finnegan v. Leu,* 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982), the court does not agree. In *Finnegan,* the court held that the removal of *appointed* officials by the newly elected union president did not violate LMRDA, since the ability of the union president to select appointed administrators who agree with his policies promoted union democracy. As the court in *Finnegan* pointed out, the Act's primary objective is to ensure that unions are democrati-

Pope, *Free Speech Rights of Union Officials under the LMRDA*, 18 Harvard Civil Rights–Civil Liberties Law Rev. 525, 568–69 (1983). While it remains to be seen whether plaintiff can carry his burden of persuading the court that it was his speech activities which prompted his removal, and not factors independent of speech, as asserted by the defendant, the court finds that the plaintiffs' have made a colorable claim that removal was based on Hayes' exercise of his speech rights.

Finally, the court finds that the granting of a preliminary injunction is consistent with the public interest in protecting union democracy, as embodied in the LMRDA. For all these reasons, the court will grant plaintiffs' first motion for preliminary injunction.

## II. IMPOUND BALLOTS IN RECALL REFERENDUM

█ The plaintiffs also seek a preliminary injunction ordering the defendant to impound the ballots that have been cast in the ongoing referendum to recall Mr. Hayes from office.[4] Plaintiffs do not challenge the right of the Union to conduct a recall referendum, but argue that the manner in which this referendum has been conducted has been unfair, and has violated the plaintiffs' rights.

Plaintiff Hayes argues that he will be irreparably injured in two ways if the current recall referendum is permitted to conclude. He asserts that he will receive fewer votes in his favor in the instant referendum than he would have received if it had been conducted fairly. In addition, he argues that if the ballots are counted and the results announced, his political reputation will be irreparably injured because the results of the referendum will be less favorable to him than they otherwise would have been.

Defendant has not stated in its legal memorandum what harm it will suffer if the ongoing recall referendum is halted and the Union is required to conduct a new referendum. Indeed, it is difficult to imagine what harm would befall the defendant, except, perhaps, the expense associated with conducting a new referendum. The court does not find this possible harm to outweigh the serious harm that plaintiff Hayes would suffer if the preliminary injunction is not granted.

In addition, the court finds that the plaintiffs have raised "grave or serious" questions of law concerning the Union's handling of the recall referendum. *See, e.g., Bauman v. Presser,* 117 LRRM 2393 (D.D. C.1984) [Available on WESTLAW, DCT database] (Court enjoins union referendum where procedures used resulted in members not receiving opposition materials soon enough to vote in an informed way. Court holds that such referendum procedures violate union members' LMRDA Title I right to a "meaningful vote.")

At the hearing, the defendant sought to distinguish *Presser* from the instant case. Defendant pointed out that in *Presser,* the balloting period lasted only twenty days, and thus it might be reasonable to require opposition materials to be sent at the same time as ballots in order for the members to receive all materials within the balloting period. In this case, defendant points out, the balloting period is 90 days—considerably longer, and thus it is not as important that opposition materials be sent at the same time.

The court is not convinced by defendant's argument. As a preliminary matter, the court does not think that it is useful for courts to have to examine balloting periods in every election to determine when the period is "too short" and when it is "long

---

cally governed and responsive to the will of their membership. In the instant case, where the removed official was elected by the membership, the court would apply the reasoning in *Lynn v. Sheet Metal Workers,* 804 F.2d 1472 (9th Cir.1986). In that case, the court reasoned that union democracy is enhanced by prohibiting union leadership from suppressing dissent by

removing elected officials on the basis of their speech.

**4.** In their motion, plaintiffs ask the court to "impound and destroy" the ballots, but at oral argument, plaintiffs asked the court merely to impound the ballots. Plaintiffs stated that if the ballots are impounded, they will seek the destruction at a later point.

enough", when mailing materials at the same time is such an easy and obvious option.

While the court is not holding that there is a *per se* rule which requires a union to mail opposition literature and ballots at the same time in all elections, in the instant case, it can imagine no reason for the Union's failure to arrange for the ballots and Hayes' literature to be mailed at the same time. At the hearing, defendant stated that it did not want Hayes to accuse it of dragging out the recall referendum, and therefore it was trying to conduct it as quickly as possible. The court is not impressed by this argument. Certainly the Union, after having received Mr. Hayes' request that he be permitted to send out literature to tell his side, could have given Mr. Hayes a limited period of time within which to submit his literature. The Union cannot claim that it was unaware that Hayes wanted to send a mailing. At best, the Union appears to not have been concerned enough with ensuring that the members received complete information before voting; at worst, it appears that the Union attempted to deliberately hinder Mr. Hayes from communicating with the membership.

Further, the court finds it disturbing that in spite of the fact that Mr. Hayes informed the GEB on April 3 that he wished to send out a mailing concerning his recall, the earliest his mailing could be sent was April 20, and yet somehow a mailing by O'Callaghan, urging recall, was able to be mailed on April 14. This fact cast doubt on the Union's claim that any delay in Mr. Hayes' mailing was due to reasonable administrative requirements in preparing the address labels, and not due to any attempt to unfairly influence the referendum.

For all these reasons, the court will grant plaintiffs' motion to impound the ballots in the current recall referendum. This injunction does not bar the defendant from instituting a new recall referendum in which materials from both sides are sent to the membership at the same time as the ballots.

## III. TEMPORARY RESTRAINING ORDER

■ The final issue before the court is the temporary restraining order currently in effect in this case. As mentioned above, the plaintiffs came to court on May 28, 1987, and were granted a TRO prohibiting the defendant from conducting further negotiations with the Maritime Service Committee concerning a contract which expires on June 15, 1987. Although the plaintiffs do not specifically seek continuance of the TRO in their motion, it appears that this is because they consider the TRO to be encompassed by the requested preliminary injunctions. Plaintiffs contend that Hayes, who was not part of the negotiating committee for this contract, should have been, and thus that if the court orders the reinstatement of Hayes, he will also be put on the negotiating committee.

The defendant, on the other hand, asserts that the issues of Hayes reinstatement and his participation on the negotiating committee, are two separate issues.

The court agrees with the defendant that the issues are separate. In ruling, above, that the preliminary injunction requesting Hayes' reinstatement will be granted, the court relied upon a showing of irreparable harm to the plaintiff, little or no harm to the defendant, and the body of law prohibiting the removal of elected officers for the exercise of their rights of free speech. The issue underlying the TRO is different.

Plaintiff Hayes contends that he should have been a part of the negotiating committee since negotiations for non industry-wide contracts are to be conducted by a negotiating committee made up of the three Offshore Vice Presidents and such additional other persons as they designate. *See* Plaintiffs' Reply Memorandum at page 11.

Defendant, however, explains that the contract being negotiated is industry-wide, and thus that Hayes has no right to be on the committee. Defendant cites a provision of the Offshore Membership Group Work Rules which states that an industry-wide contract will be approved by a majority of the negotiating committee, but does not specify the composition of the committee.

*See* Defendant's Opposition Memorandum at page 6. Defendant further argues that even if Hayes was entitled to be on the committee, there is no irreparable harm caused by his exclusion since the work of the committee is conducted by majority vote, and the other members could have out-voted him.

To determine whether the TRO should be extended or changed into a preliminary injunction, the court will again refer to the factors enumerated in *Blackwelder Furniture Co. v. Seilig Manufacturing Co., supra.*

1. Harm to the plaintiffs

Plaintiffs contend that the Offshore members will be irreparably harmed if Hayes is not placed on the negotiating committee, for it would mean that the new contract negotiations were conducted without the Offshore members being represented by someone they elected. However, according to the defendant, the members of the committee were Robert Lowen, President, F. Elwood Kyser, Secretary–Treasurer (formerly Vice President—Gulf Ports), and David York, Vice President—Pacific Ports. Thus, two out of the three members of the committee were people who had been elected to positions of Offshore Vice President by the same membership body which had elected Mr. Hayes.

The court understands plaintiffs' argument that merely having Hayes participating in the process of negotiating, regardless of the fact that he could be out-voted, would have changed the nature of the negotiations. However, in analyzing "irreparable harm," the court finds this alleged harm very speculative.

2. Harm to the Defendant

In counterpoint to the alleged injury to the plaintiff if a preliminary injunction is not granted is the harm to the defendant if an injunction is granted. Defendant argues that it will be seriously and irreparably harmed if the court grants the relief sought by the plaintiffs. Defendant says that the contract negotiations have been a delicate matter, taking a long period of time, and if the court blocks negotiations on the eve of the contract's expiration, it could result in the collapse of the collective bargaining agreement altogether. Defendant asserts that the collective bargaining agreement which is the subject of plaintiffs' allegations is an industry-wide amendment to a previously ratified collective bargaining agreement. The industry-wide contract has an expiration date of June 15, 1987. Defendant points out that some of the amendments to the contract became effective in January, 1987, and that Hayes was well aware in January of these negotiations and the fact that he had not participated in them. *See* Exhibits A and B to Lowen Affidavit, Defendant's Opposition.

The court finds that the harm to the defendant far outweighs the rather abstract injury asserted by the plaintiffs. Further, the court cannot help but wonder why plaintiff Hayes, who knew of this dispute over the composition of the negotiating committee at least since January 1987, waited until the very eve of the expiration of the contract to come into court.

3. Plaintiffs' likelihood of success

Because the harm to the defendant far outweighs any injury to the plaintiffs, the plaintiffs must demonstrate a likelihood of success on the merits in order for a preliminary injunction to issue. After reviewing the issue, the court is not convinced that plaintiffs have demonstrated likelihood of success. Although the record before the court is necessarily scanty because of the speed with which this matter has been presented to the court, it appears that there is merit in defendant's argument that the contract being negotiated is industry-wide, and that Hayes has no specific right to be on the negotiating committee. In light of these factors, and the public policy in favor of industrial stabilization through the collective bargaining agreement, (*see, e.g., United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 578, 80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409 (1960)), the court will vacate the temporary restraining order.

The court will enter a separate order setting forth the rulings made in this memorandum.

## ORDER

For the reasons set forth in the foregoing memorandum, it is this 8th day of June, 1987, by the United States District Court for the District of Maryland,

ORDERED:

(1) that plaintiffs' motions for preliminary injunctions be, and the same hereby are, *Granted;*

(2) that defendant shall promptly reinstate plaintiff Hayes to the office of Vice President—Atlantic Ports pending the outcome of a fair recall referendum, should defendant choose to conduct one; that defendant shall promptly notify all MM & P members as well as the employers of MM & P members in the Offshore Group of Hayes' reinstatement to office, with full salary and benefits, and authority to engage in all tasks associated with that office;

(3) that defendant shall impound and keep sealed until further court order all ballots cast during the Hayes recall referendum initiated in April 1987;

(4) that the temporary restraining order, entered on May 28, 1987, and extended by order made in open court on June 5, 1987, be, and the same hereby is, *Vacated.*